AUSA: Ariana L. Bloom

| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF NEW YORK | **2 6 MAG   1 7 9** |
| UNITED STATES OF AMERICA<br><br>v.<br><br>JULIO CASERES COLINA,<br><br>Defendant. | **SEALED COMPLAINT**<br><br>Violations of<br>18 U.S.C. §§ 1951 and 2.<br><br>COUNTY OF OFFENSE:<br>NEW YORK |

SOUTHERN DISTRICT OF NEW YORK, ss.:

BRIAN MCCARTHY, being duly sworn deposes and says that he is a Task Force Officer with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and charges as follows:

## COUNT ONE
### (Hobbs Act Robbery Conspiracy)

1. On or about January 9, 2026 and on or about January 14, 2026, in the Southern District of New York and elsewhere, JULIO CASERES COLINA, the defendant, and others known and unknown, knowingly combined, conspired, confederated, and agreed together and with each other to commit robbery, as that term is defined in Title 18, United States Code, Section 1951(b)(1), and would and did thereby obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), to wit, CASERES conspired together and with others to commit armed robberies of commercial establishments, including a gunpoint robbery of a retail store in Queens, New York on or about January 9, 2026 and a gunpoint robbery a retail store in Manhattan, New York on or about January 14, 2026.

(Title 18, United States Code, Section 1951.)

## COUNT TWO
### (Aiding and Abetting Hobbs Act Robbery)

2. On or about January 9, 2026, in the Southern District of New York and elsewhere, JULIO CASERES COLINA, the defendant, knowingly aided and abetted the commission of a robbery, as that term is defined in Title 18, United States Code, Section 1951(b)(1), and thereby obstructed, delayed, and affected commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), to wit, CASERES, the defendant, aided and abetted the commission of a gunpoint robbery of a retail store in New York, New York.

(Title 18, United States Code, Section 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

3. I am a Task Force Officer with the ATF and am currently assigned to the Sparta Joint Robbery Task Force (the "Task Force") comprised of members of ATF and the New York City Police Department (the "NYPD"). I have been personally involved in the investigation of this matter. This affidavit is based upon my investigation, my conversations with law enforcement agents and others, and my examination of reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

4. The Task Force is investigating two armed robberies of retail stores that sell, among other things, collectable merchandise related to Pokémon, which is a popular multimedia media franchise that includes videogames and collectible trading cards, commonly referred to as Pokémon cards (the "Pokémon Retail Stores"). The first armed robbery in this investigation occurred on or about January 9, 2026 in Queens, New York (the "Queens Robbery"), and the second armed robbery in this investigation occurred on or about January 14, 2026 in Manhattan, New York (the "Manhattan Robbery" and, collectively, the "Robberies"). During the Robberies, multiple masked individuals entered the Pokémon Retail Stores brandishing guns, pointing them at customers and store employees, and using hammers to smash display cases to steal rare collectible Pokémon cards and other merchandise believed to exceed $100,000 in value.

5. For the reasons described in Paragraphs 6 through 11, *infra*, I know that JULIO CASERES COLINA, the defendant, conspired with others to commit the Queens Robbery and the Manhattan Robbery and aided in the commission of both the Queens Robbery and the Manhattan Robbery.

### The Queens Robbery

6. Based on my participation in this investigation, my conversations with other law enforcement officers, my review of law enforcement reports, and my review of surveillance video from the location of the Queens Robbery, I have learned the following, in substance and in part:

   a. On or about January 9, 2026, at approximately 8:50 p.m., approximately three males (the "Queens Robbers") wearing dark clothes, gloves, and ski masks entered the first of the Pokémon Retail Stores ("Store-1"), which is located in the vicinity of 64-17 39th Avenue in Queens, New York.

   b. Once inside Store-1, two of the Queens Robbers ("Queens Robber-1" and "Queens Robber-2') pulled out firearms and displayed them to the other individuals inside of Store-1, including customers and employees, demanding cash and Pokémon merchandise.

   c. Queens Robber-1 approached a customer who had been viewing Pokémon merchandise at one of the display counters of Store-1. Queens Robber-1 pointed his firearm at the customer and took Pokémon merchandise out of the customer's hands. The below still image captured from surveillance footage inside Store-1 during the commission of the Queens Robbery, shows Robber-1 displaying a firearm (circled in white) and taking Pokémon merchandise (circled

in red) from an individual in Store-1.[1]



       d.     Queens Robber-2, who was carrying a multicolored backpack and also brandishing a firearm, approached a Store-1 employee ("Employee-1"), who was behind the counter. After hitting Employee-1 in the chest, Queens Robber-2 pointed a black and silver firearm at Employee-1, opened the multicolored backpack, and demanded, in substance and in part, that Employee-1 fill the backpack with Pokémon merchandise. Employee-1 and another individual (specifically, the owner of Store-1) then put Pokémon merchandise into Queens Robber-2's backpack. Employee-1 then handed the backpack containing Pokémon merchandise back to Queens Robber-2. The still image below captured from surveillance footage inside Store-1 during the commission of the Queens Robbery, shows Employee-1 handing the multicolored backpack (circled in red) back to Queens Robber-2, as Queens Robber-2 points a firearm (circled in white) at Employee-1.

---

[1] The image depicted here from the surveillance footage contains redactions on the faces of the individuals in the center and far-right of the image.



e. While Employee-1 and the owner of Store-1 were filling the multicolored backpack at gunpoint, Queens Robber-2 began removing Pokémon merchandise from one of Store-1's display cases nearby. Queens Robber-2 and Queens Robber-3 then placed the Pokémon merchandise inside a black backpack that Queens Robber-3 had been wearing.

f. The Queens Robbers also stole approximately $1,000 of cash from Store-1's cash register.

g. The Queens Robbers then exited Store-1 with the cash from Store-1's cash register and Pokémon merchandise, which was worth approximately $11,700. The Queens Robbers fled down 39th Avenue towards 64th Street, in Queens, New York.

### The Manhattan Robbery

7. Based on my participation in this investigation, my conversations with other law enforcement officers, my review of law enforcement reports, and my review of surveillance video from the location of the Manhattan Robbery and surrounding businesses, I have learned the following, in substance and in part:

a. On or about January 14, 2026, the second of the Pokémon Retail Stores ("Store-2") in the vicinity of 412 West 13th Street in Manhattan, New York was hosting a community event that drew a significant number of customers.

b. During the event on or about January 14, 2026, at approximately 6:40 p.m.,

approximately three males (the "Manhattan Robbers") wearing dark clothes and ski masks entered Store-2. At this time, there were approximately 40 customers and several employees in Store-2.

   c. Once inside Store-2, one of the Manhattan Robbers pulled down the blinds so that the windows to Store-2 were covered. Then, one of the Manhattan Robbers ("Manhattan Robber-1") proceeded towards a glass display case in the back of the store, pulled out a hammer, and started striking the glass display case with the hammer, in an attempt to break the protective glass and access the Pokémon merchandise in the display case. The still image below, captured from surveillance footage inside Store-2 during the commission of the Manhattan Robbery, shows Manhattan Robber-1 approaching the glass display case with a black and silver hammer (circled in white).



   d. A second Manhattan Robber ("Manhattan Robber-2")—who was wearing a multicolored backpack that appeared consistent with the multicolored backpack described in Paragraph 6(d), *supra*—pointed a black and silver firearm at an employee of Store-2, and, once Manhattan Robber-1 smashed the glass display case with the hammer, proceeded to grab Pokémon merchandise from the display case and put it into Manhattan Robber-1's black backpack. The still images below are captured from surveillance footage inside Store-2 during the commission of the Manhattan Robbery. The image on the left below shows Manhattan Robber-2 pointing a firearm at an employee of Store-2. The image on the right below shows Manhattan Robber-2 displaying a firearm (circled in white) while filling Manhattan Robber-1's backpack with Pokémon merchandise that he had removed from the smashed display case inside Store-2.



e.     During this time, a third Manhattan Robber ("Manhattan Robber-3") stood guard in front of the front door to Store-2, keeping customers and employees of Store-2 inside Store-2 for the duration of the Manhattan Robbery.

f.     In addition to Pokémon merchandise, the Manhattan Robbers also took approximately $1,000 of cash from Store-2's cash register.

g.     The Manhattan Robbers then exited Store-2 with the cash from Store-2's cash register, Pokémon merchandise worth approximately $115,995, and a cellphone stolen from a customer who was inside Store-2 at the time of the Manhattan Robbery.

h.     The Manhattan Robbers fled westbound on 13th Street in Manhattan, New York on foot.

### Identification of CASERES

8.     Based on my participation in this investigation, my conversations with other law enforcement officers, my review of law enforcement reports, and my review of surveillance video, I have learned the following, in substance and in part:

a.     At approximately 6:36 p.m. on or about January 14, 2026—that is, approximately four minutes before the commission of the Manhattan Robbery—a white van with New Jersey license plate number XPLL80 (the "White Van") stopped in front of an establishment approximately 413 feet from Store-2.

b.     At approximately 6:39 p.m. on or about January 14, 2026—that is, approximately one minute before the commission of the Manhattan Robbery—three males wearing dark clothing and masks exited the White Van and headed eastbound on 13th Street, which is the direction of Store-2.

6

        c.       At approximately 6:47 p.m. on or about January 14, 2026—that is, approximately seven minutes after the Manhattan Robbers entered Store-2 and began committing the Manhattan Robbery—the three males wearing dark clothing and masks jumped into the White Van, which then traveled westbound on West 13th Street, away from Store-2.

        d.       The White Van is registered in the name "Julio Caseres Colina," which is the name of JULIO CASERES COLINA, the defendant.

       9.       Based on my review of documents and records from U.S. Customs and Border Protection, I know that on or about April 8, 2025, JULIO CASERES COLINA, the defendant, was stopped driving the White Van and issued a ticket for driving without a license.

       10.      Based on my participation in this investigation, my conversations with other law enforcement officers, and my review of law enforcement reports, records, and recordings, I know that on or about January 20, 2026, JULIO CASERES COLINA, the defendant, was arrested on unrelated charges and taken to the 115th precinct of the NYPD. CASERES was in the White Van when he was arrested. At the 115th precinct on or about January 21, 2026, CASERES was advised of his *Miranda* rights and voluntarily agreed to speak with law enforcement officers. After being advised of his *Miranda* rights and voluntarily agreeing to speak with law enforcement officers, CASERES told law enforcement officers the following, in substance and in part, admitting to his role in the Robberies:[2]

       a.       Over the summer of last year, CASERES met an individual ("Individual-1") and CASERES began selling what he described as "antique goods" with Individual-1.

       b.       In January 2026—that is, the month in which the Robberies were committed—CASERES agreed to drive Individual-1 and other individuals in his car, the White Van, on two different occasions.

       c.       CASERES said the following about the first occasion on which he drove Individual-1 and others, which coincided with the Queens Robbery:

       i.       In early January 2026, Individual-1 and three other individuals (together with Individual-1, the "Queens Passengers") wearing all black and ski masks got into CASERES's car and directed that CASERES drive them to a location in Queens, New York. The Queens Passengers had three firearms with them in CASERES's car.

       ii.      In addition to the three firearms, one of the Queens Passengers had a backpack that, like the multicolored backpacks worn by Queens Robber-2 and Manhattan Robber-2, appeared to depict a cartoon character. Another one of the Queens Passengers was

---

[2] Based on my review of the recorded interview, I know that CASERES speaks Spanish, and the interview was conducted through a Spanish interpreter. Based on my review of the recorded interview, my participation in this investigation, and my conversations with other law enforcement officers, I further know that the advisement of CASERES's *Miranda* rights and the form that CASERES signed confirming his understanding and willingness to speak with law enforcement were both in Spanish.

wearing a black backpack. The Queens Passengers told CASERES that they could gift CASERES things if their "bags" were "packed" upon their return.

iii. CASERES then drove to a dark residential street and parked the White Van, and the Queens Passengers exited the White Van.

iv. The Queens Passengers returned approximately fifteen minutes later. When they returned, the Queens Passengers held their backpacks in front of them and directed CASERES to drop them off at a location approximately three blocks away, which CASERES did.

v. Before exiting the White Van on or about January 9, 2026, Individual-1 told CASERES that he would "gift" CASERES a couple of "good things" the next day. The next day, Individual-1 gave CASERES approximately $100 for gas, along with various items, such as batteries and women's clothing, that CASERES was able to sell for profit.

d. CASERES said the following, in substance and in part, about the second occasion on which he drove Individual-1 and others, which coincided with the Manhattan Robbery:

i. Shortly after the first occasion described in Paragraph 10(c), *supra*, (*i.e.*, the Queens Robbery) Individual-1 contacted CASERES and asked CASERES to drive again. Because Individual-1 had "gifted" CASERES good items after the first trip, CASERES agreed to drive for Individual-1 again.

ii. This time, CASERES drove Individual-1 and four individuals wearing dark clothing and masks (together with Individual-1, the "Manhattan Passengers") to a location in Manhattan, New York. CASERES parked the White Van after arriving at the location, and the Manhattan Passengers got out of the White Van.

iii. About fifteen minutes later, the Manhattan Passengers got back into the White Van. At that point, the Manhattan Passengers indicated to CASERES that he should drive away quickly.[3]

iv. Law enforcement showed CASERES images captured from surveillance footage of the location of Manhattan Robbery that depict Manhattan Robber-2 displaying a firearm during the commission of the Manhattan Robbery. CASERES identified the firearm in the images as one of the firearms that the Manhattan Passengers had in the White Van and noted that the Manhattan Passengers hit him with the firearm depicted below when they returned to the White Van on or about January 14, 2026.

---

[3] Although CASERES claimed he did not know what the Manhattan Passengers were doing when they left the White Van, I believe this was an attempt to minimize his involvement in the Robberies, considering that CASERES admitted to driving Individual-1 and others to Queens a short time earlier, knowing that the Queens Passengers were carrying guns and that CASERES was promised "gifts" if the Queens Passengers were able to "pack" their "bags."

e.  On or about January 21, 2026, CASERES also provided law enforcement with written consent to search his cellular device. On CASERES's cellular device, law enforcement located a video taken from what appeared to be the approximate location of the Manhattan Robbery. Based on information on the cellular device, the video was taken on or about January 13, 2026 at approximately 7:07 p.m., that is, the day before the Manhattan Robbery and shortly after the 7 p.m. closing time of Store-2. When asked about the video on his cellular device, CASERES informed law enforcement officers that the day before the Manhattan Robbery CASERES drove Individual-1 and three other individuals wearing all black and masks, who directed CASERES to the location where the Manhattan Robbery ultimately took place.

11.  Based on my participation in this investigation, my conversations with other law enforcement officers, and my review of law enforcement documents and records, I know the following:

a.  On or about January 21, 2026, CASERES signed a written consent form in Spanish permitting law enforcement to search the White Van, which, as noted in Paragraph 10, *supra*, CASERES was inside of at the time he was arrested on unrelated charges on or about January 20, 2026.

b.  When law enforcement searched the White Van, they recovered a hammer with a silver top, a black handle, and a blue bottom that appeared consistent with the hammer used by Manhattan Robber-1 in the Manhattan Robbery, as described in Paragraph 7(c), *supra*. The images on the left and in the middle below are image of Manhattan Robber-1 holding the hammer (circled in red) used during the commission of the Manhattan Robbery. The image on the right below is a photograph that law enforcement took of the hammer found in the White Van.



\* \* \*

12.  Based on the information set forth in Paragraphs 6, 9 and 10(a) through 10(c), *supra*, I believe that the JULIO CASERES COLINA, the defendant, drove the Queens Robbers to commit the Queens Robbery and helped them flee after committing the Queens Robbery.

13.     Based on the information set forth in Paragraphs 7 through 9, 10(d) and 11, *supra*, I believe that the JULIO CASERES COLINA, the defendant, drove the Manhattan Robbers to commit the Manhattan Robbery and helped them flee after committing the Manhattan Robbery.

WHEREFORE, I respectfully request that JULIO CASERES COLINA, the defendant, be arrested, and imprisoned or bailed, as the case may be.

_____
BRIAN MCCARTHY
Task Force Officer
Bureau of Alcohol, Tobacco, Firearms and Explosives

Sworn to before me this 22nd day of January, 2026.

_____
THE HONORABLE SARAH NETBURN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK